**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Todd D. Schuler,

Plaintiff,

v.

SuperValu, Inc., a foreign corporation,

Defendant.

Civil No. 01-1033 (RHK/JMM)
**MEMORANDUM OPINION AND ORDER**

---

Judith K. Schermer, Judith K. Schermer, P.L.L.C., Minneapolis, Minnesota, for Plaintiff.

Paul J. Zech and Lee A. Lastovich, Felhaber, Larson, Fenlon & Vogt, P.A., Minneapolis, Minnesota, for Defendant.

---

## Introduction

In September of 1999, Plaintiff Todd D. Schuler applied for a job as an "order selector" at Defendant SuperValu, Inc.'s warehouse in Hopkins, Minnesota. SuperValu conditionally offered Schuler the job pending the results of a pre-placement medical examination. At the examination, Schuler told the doctor that he had epilepsy and was taking anti-seizure medications. The doctor submitted a medical recommendation form to SuperValu stating that Schuler was medically recommended for work in the warehouse with the following restrictions: that Schuler not drive a "forklift," not work at unprotected heights, and not work around "unprotected dangerous machinery." Based on those



MAY 0 9 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD MAY 0 9 2002
DEPUTY CLERK

restrictions, SuperValu concluded that Schuler could not perform an essential function of the order selector's job -- the use of a motorized "lift truck" to gather merchandise from around the warehouse and fill orders placed by retail grocery stores. SuperValu therefore withdrew its offer of employment.

Schuler has brought a one-count complaint against SuperValu, asserting a claim of disability discrimination under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. Before the Court is SuperValu's Motion for Summary Judgment. For the reasons set forth below, the motion will be granted.

**Background**

Schuler is a forty-one year old man with a high school degree and approximately eighteen months of college education. (See Schuler Dep. at 16; Schermer Aff. Ex. 3 (Employment Application for SuperValu).) Schuler has experienced grand mal seizures since he was thirteen years old. (Schuler Aff. ¶ 4.) He has seen doctors for his condition and has been prescribed medications to reduce his seizures. (Id. ¶ 5.) He presently takes two medications -- dilantin and mysoline -- to manage his seizures. (Id. ¶ 7.) In recent years, Schuler has undergone an annual medical examination to ensure that his medication levels are within a therapeutic range. (Id. ¶ 8.) As a result of these check-ups, the dosage of his medications is sometimes adjusted. (Id.)

Schuler has worked in Wyoming for much of his adult life. When work there became slow, his father invited him to come to the Twin Cities to look for a job. (Schuler

Aff. ¶ 25.) On September 14, 1999, Schuler applied for a warehouse job at Only Deals and was hired to work full-time on the third shift as a warehouse worker effective September 28, 1999. (Schuler Aff. ¶ 26; Schermer Aff. Ex. 19 (Schuler's Only Deals personnel file).) In that job, Schuler used an electric pallet jack to move merchandise and to load and unload trucks. (Schuler Dep. at 29-30; Schuler Aff. ¶ 27.) Only Deals did not require Schuler to undergo a physical examination in connection with his application for employment there. (Schuler Dep. at 28.)

In late September, Schuler's father told him that SuperValu was looking to hire warehouse workers. (Schuler Aff. ¶ 29.) The position at SuperValu paid more than Schuler would earn at Only Deals. (Id.) On September 26, 1999, Schuler filled out an application for SuperValu and interviewed for the warehouse position.[1] (Schermer Aff.

---

[1] SuperValu asserts that an essential function of the order selector position is the operation of motorized industrial equipment and that nearly all of a person's work day is spent on or around a motorized lift truck. (See Schermer Aff. Ex. 1 at 3 (Def.'s Answers to Interrogs.); Moore Dep. at 31-32.) Schuler claims that SuperValu did not tell applicants that using motorized equipment was part of the job. Schuler relies on a "Warehouse Order Selector Position Information Sheet" stating that an order selector is

> expected to lift cases of groceries repetitively throughout [the] shift. The average case weight is 25 lbs.; however, some cases that you will have to lift may weigh up to 100 lbs. To be hired, you must pass a physical ability assessment. This involves a strength and endurance test, and a drug and alcohol screen.

(Schermer Aff. Ex. 2 (Warehouse Order Selector Position Information Sheet).) The job description for the order selector position states, however, that the position calls for operating various power equipment, including load transfer machines and power jacks. (Lastovich Aff. Ex. 18 (job description).)

Ex. 3 (Schuler's Employment Application).) During the interview process, Schuler did not tell anyone that he had epilepsy or a seizure disorder. (Schuler Dep. at 92.) SuperValu offered Schuler a job, contingent on the results of a pre-placement medical examination. (Schermer Aff. Ex. 1 at 2 (Def.'s Answers to Interrogs.); Schuler Aff. ¶ 30.)

On October 4, Schuler went to Occupational Medical Consultants ("OMC") for the pre-placement physical examination. He indicated on a questionnaire that he had epilepsy and was taking anti-seizure medications.[2] (Schuler Aff. ¶ 31; Schermer Aff. Ex. 8 (pre-placement questionnaire).) After completing the questionnaire, he was examined by a doctor. (Schuler Dep. at 90.) Following the examination, OMC sought medical records containing the results of Schuler's blood tests from March of 1998 and 1999. (Schermer Aff. Exs. 11 and 12 (blood test results).) OMC sent a form to SuperValu advising them that the medical recommendation was "on hold for medical

[2] The examining physician wrote that Schuler had suffered from a "seizure disorder since age 13." The doctor noted that Schuler said the last seizure had been years ago and that the seizures were controlled well with the medications he was taking. The doctor also recorded that Schuler last had a check up in August of 1999. (Schermer Aff. Ex. 8 (Pre-placement questionnaire).) Schuler admitted that he lied when he told the doctor that he had not had a seizure for years; he had had one weeks before. (Schuler Dep. at 93.) On the questionnaire, Schuler indicated that he had never used addictive drugs. (Schermer Aff. Ex. 8.) In his deposition, however, he admitted to having used "crank," a form of methamphetamine, which he recognized is an addictive drug. (Schuler Dep. at 89.) Schuler also indicated on the questionnaire that he had never been treated for drug or alcohol usage. (Schermer Aff. Ex. 8.) He acknowledged in his deposition, however, that that representation was false; he had undergone treatment for alcoholism. (Schuler Dep. at 42-43, 89-90.)

records." (Lastovich Aff. Ex. 10 (Oct. 4, 1999 Medical Recommendation Form).) Three days later, a physician from OMC issued a medical recommendation to SuperValu, indicating that Schuler was "medically recommended" for the warehouse position with the following restrictions: "no working around unprotected dangerous equipment or unprotected heights," and "no forklift driving." (Schermer Aff. Ex. 14 (Oct. 7, 1999 OMC Medical Recommendation Form).)

Schuler and SuperValu present different accounts of how SuperValu told Schuler that it was withdrawing its job offer to him. According to Schuler, on the same day as his medical examination, a nurse at OMC told him that restrictions were being placed on him of "no heights" and "no running equipment." (Schuler Dep. at 98.) Schuler asserts that, when he protested to the nurse that he would not get the job, the nurse advised him to go see a lawyer if SuperValu did not hire him because of those restrictions. (Id.) Schuler avers that he then went home and called Dr. Jetzer to find out why medical restrictions had been placed on him. (Id. at 99.) Schuler asserts that Dr. Jetzer said he imposed the medical restrictions because Schuler had epilepsy; Schuler asked Dr. Jetzer whether he would do the same thing if another epileptic came to OMC, and Dr. Jetzer responded that he would. (Id. at 99.) Schuler did not ask Dr. Jetzer if there was anything he could do to get the restrictions removed. (Id.)

Schuler avers that, after he had talked to Dr. Jetzer, he called SuperValu to find out about the status of the job offer. (Id. at 101.) A person at SuperValu told Schuler that

they had not received his paperwork from OMC. (Id.) Schuler called OMC and was told that the paperwork had been sent to SuperValu and that OMC would send over another copy by facsimile immediately. Several minutes later, Schuler called SuperValu again. He spoke with Sue Hanson, a human resources specialist, who told him that she had just received his paperwork and that SuperValu could not hire him because of the restrictions. (Id. at 102-03.) When asked by Schuler who does the hiring at SuperValu, Sue Hanson answered, "her husband." (Id. at 101-02.) Schuler next spoke to Mr. Hanson, who told Schuler that if he (Schuler) could get OMC to lift the restrictions, SuperValu could hire him. (Id. at 102.)

In contrast to Schuler's account of events, Sue Hanson testified that after she received the October 4 and October 7 medical recommendation forms from OMC, she decided to withdraw the offer of employment because the position involved the substantial use of motorized industrial trucks, such as powered pallet lifts. (Hanson Dep. at 18.) Sue Hanson testified that she understands the term "forklift" to include all heavy machinery involved in material handling, including power pallet jacks and lift trucks. (Id. at 57.) Sue Hanson avers that she telephoned Schuler and told him that he had been medically recommended for hire with restrictions that could not be accommodated and, therefore, she was withdrawing the offer of employment. (Id. at 59.) According to Hanson, Schuler responded by saying that she was discriminating against him because he was epileptic. (Id. at 59-60.)

Regardless of which version of events leading up to Schuler's telephone conversation with Sue Hanson is correct, several facts are undisputed. Schuler did not tell anyone at SuperValu, prior to the job offer being withdrawn, that he had epilepsy or a seizure disorder. (Schuler Dep. at 92, 103, and 106; Hanson Dep. at 60.) SuperValu did not tell Schuler that it was withdrawing its job offer for any reason other than the doctor's restrictions. (Schuler Dep. at 103; Hanson Dep. at 59.) Schuler did not follow up with SuperValu after Mr. Hanson said that SuperValu would hire Schuler if he (Schuler) got the restrictions lifted. (Id. at 109.) Schuler did not ask if any other jobs were available to him at SuperValu.[3] (Id.)

**Analysis**

## I. Standard of Decision

Summary judgment is proper if, viewing the record in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that the material facts in the case are undisputed. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Mems v. City of St. Paul, Dep't of Fire &

---

[3] After SuperValu declined to hire him, Schuler continued to work at Only Deals. (See Schermer Aff. Ex. 19 (Schuler personnel file from Only Deals). In March of 2000, Only Deals promoted Schuler to a supervisor position. (Id.; Schuler Aff. ¶ 28.) Effective March 1, 2001, Only Deals made Schuler's position salaried. (Schermer Aff. Ex. 19.) Within six months, however, he was terminated for absenteeism. (Id.) Since November of 2001, he has worked at Cub Foods as a shelf stocker. (Schuler Aff. ¶ 2.)

Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The court must view the evidence, and the inferences which may be reasonably drawn from it, in the light most favorable to the nonmoving party. See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997).

The nonmoving party may not rest on mere allegations or denials, but rather must demonstrate the existence of specific facts that create a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995). The court does not weigh facts or evaluate the credibility of affidavits and other evidence on a motion for summary judgment. See Liberty Lobby, 477 U.S. at 249. The nonmovant, however, cannot avoid summary judgment in favor of the movant merely by pointing to some alleged factual dispute between the parties. Instead, any fact alleged to be in dispute must be "outcome determinative under prevailing law," that is, it must be material to an essential element of the specific theory of recovery at issue. See Dancy v. Hyster Co., 127 F.3d 649, 652 (8th Cir. 1997); Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992).

In a case alleging disability discrimination, as in any employment discrimination case,

> the plaintiff must initially present a prima facie case to survive a motion for summary judgment. The employer must then rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for the adverse employment action. If the employer does this, the burden of production shifts back to the plaintiff to demonstrate that the employer's

non-discriminatory reason is pretextual.

Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1134-35 (8th Cir. 1999) (internal citations omitted). To state a prima facie case of disability discrimination, Schuler must show that (1) he is disabled within the meaning of the ADA, (2) he was qualified to perform the essential functions of the position he sought, and (3) he suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination. See id. at 1135. SuperValu argues that summary judgment on Schuler's ADA claim is warranted because Schuler cannot establish that he is "disabled" as required by the first prong of the prima facie case. SuperValu also argues that, even if Schuler can state a prima facie case of discrimination, its actions were legally privileged because Schuler posed a direct threat to himself and others. The Court begins with Schuler's prima facie case.

## II. Schuler's Claim that He Was "Regarded As" Having a Disability

The ADA protects those who have a "disability," a term defined as:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). Schuler does not claim that he falls within the first or second subparts of the above definition.[4] (See Pl.'s Mem. Opp'n to Summ. J. at 15.) Rather,

[4] The parties do not dispute that Schuler's epilepsy or seizure disorder is a "physical or mental impairment," as that term is construed by EEOC regulations.

Schuler argues that he was "regarded as" being substantially limited in the major life activity of working due to his epilepsy. (See id.) "In 'regarded as' actions, the plaintiff must show that the employer or potential employer 'entertain[ed] misperceptions about the individual--it must [have] believe[d] either that one ha[d] a substantially limiting impairment that one [did] not have or that one ha[d] a substantially limiting impairment when, in fact, the impairment [was] not so limiting.'" Conant v. City of Hibbing, 271 F.3d 782, 785 (8th Cir. 2002) (quoting Sutton v. United Air Lines, 527 U.S. 471, 489 (1999)). The present case falls into the latter category: Schuler alleges that SuperValu believed that his epilepsy substantially limited him in the major life activity of working when, in fact, his impairment was not so limiting.

SuperValu argues that Schuler cannot establish that he is disabled under the "regarded as" prong because he cannot show that SuperValu knew that he had a physical or mental impairment at the time it made the decision to withdraw the employment offer. As noted above, Schuler did not tell anyone at SuperValu, prior to the job offer being withdrawn, that he had epilepsy or a seizure disorder. (Schuler Dep. at 92, 103, and 106; Hanson Dep. at 60.) Schuler did, however, tell OMC about his epilepsy. Schuler argues strenuously that Dr. Jetzer was the "company doctor" for SuperValu; therefore, his actions may be imputed to SuperValu. The record establishes, however, that the clinic for which Dr. Jetzer works, OMC, is an independent entity that performs medical examinations and provides other services for SuperValu and other businesses in the Twin

Cities. SuperValu has no ownership interest in OMC, nor does it participate in the management of the clinic. (See Jetzer Dep. at 78.) Even if one could impute to SuperValu the knowledge and actions of Dr. Jetzer, however, the plaintiff still fails to satisfy the first element of his prima facie case.

A substantial limitation on the major life activity of **working** means that an individual must be "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared with the average person having comparable training, skills, and abilities." 29 C.F.R. § 1630.2(j)(3)(i). "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." Id.; see also Sutton, 527 U.S. at 493; Murphy v. United Parcel Serv., Inc., 527 U.S. 516, 523 (1999). Thus, to establish that SuperValu regarded him as substantially limited in the major life activity of working, Schuler "cannot merely show that the [potential] employer perceived him as precluded from one type of job, a specialized job, or a particular job of choice." EEOC v. Automatic Sys. Co., 169 F. Supp. 2d 1001, 1006-07 (D. Minn. 2001) (Doty, J.).

Schuler has not presented evidence from which a jury could reasonably find that SuperValu regarded Schuler as being substantially limited from a "class of jobs" or a "broad range of jobs in various classes." Regulations promulgated by the EEOC define a "class of jobs" as "[t]he job from which the individual has been disqualified . . . and ***the number and types of jobs utilizing similar training, knowledge, skills or abilities, within***

***that geographical area***." 29 C.F.R. § 1630.2(j)(3)(ii)(B) (emphasis added). A "broad range of jobs in various classes" is defined as "the job from which the individual has been disqualified . . . and ***the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment***." Id. § 1630.2(j)(3)(ii)(C) (emphasis added). A plaintiff claiming that the employer regarded him as being substantially limited in the major life activity of working must therefore present some evidence of the number and types of jobs within the geographical area to which he had reasonable access and that fit his vocational profile. See Sutton, 527 U.S. at 492-93; Murphy, 527 U.S. at 524; Fjellstad v. Pizza Hut of Am., Inc., 188 F.3d 944, 949 (8th Cir. 1999) (reversing and remanding summary judgment for employer where plaintiff presented an analysis by an occupational specialist establishing the number of available jobs in the state fitting plaintiff's vocational profile, the percentage of jobs for which she was ineligible due to functional limitations, and the percentage reduction in plaintiff's employability and labor market access); Ciszewski v. Engineered Polymers Corp., 179 F. Supp. 2d 1072, 1088 (D. Minn. 2001) (Tunheim, J.) (observing that courts "repeatedly grant summary judgment on ADA claims of disability where a plaintiff produces nothing more than their medical restrictions" as evidence that they are substantially limited in the major life activity of working); see also Duncan v. Washington Metro. Area Trans. Auth., 240 F.3d 1110, 1115 (D.C. Cir.) (en banc) (overturning jury verdict for plaintiff with 20-pound lifting

restriction on grounds that he failed to produce evidence regarding the number and type of jobs in the same geographical area that he was excluded from due to restriction), cert. denied, 122 S. Ct. 49 (2001).

At most, a reasonable jury could find that SuperValu believed Schuler's epilepsy rendered him incapable of using or working around heavy equipment or working at heights. Schuler has presented no evidence regarding (1) the geographic area in which he could obtain work, (2) the number and type of jobs in that area that fit his vocational profile, and (3) the percentage of those jobs from which he would be excluded if the medical restrictions imposed by OMC were applied. Schuler contends that at least one of the restrictions placed on him has been an element of many of the jobs he held in Wyoming. Schuler reasons that, under OMC's restrictions, he would not have been able to hold those jobs; therefore, by accepting those restrictions, SuperValu regarded him as substantially limited in the major life activity of working. Anecdotal evidence regarding a handful of jobs in another geographic area is not sufficient to give rise to a genuine issue of material fact as to whether the restrictions SuperValu believed were appropriate for Schuler substantially limited him in the major life activity of working in the Twin Cities area. Accordingly, summary judgment for SuperValu is appropriate.

**Conclusion**

Based on the foregoing, and all of the files, records and proceedings herein, **IT IS ORDERED** that the Defendant's Motion for Summary Judgment (Doc. No. 32) is

**GRANTED.** The Amended Complaint (Doc. No. 3) is hereby **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: May 9, 2002

RICHARD H. KYLE
United States District Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

C:\FORMS\APPEAL NO. CIV
Rev. August 11, 1995

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information <u>must</u> be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*